803 S.E.2d 882

KAN ENTERPRISES, INC., d/b/a A1 Food Stores, Appellant,

v.

SOUTH CAROLINA DEPARTMENT OF REVENUE, Ellen Fishburne Triplett, Keith McIver, Samuel L. Munson, Jocelyn Munson, and Michael Hill, Respondents.

Appellate Case No. 2015-000733
Opinion No. 5497

Court of Appeals of South Carolina.

Submitted June 1, 2017
Filed July 12, 2017
Rehearing Denied September 22, 2017

S. Jahue Moore and John C. Bradley, Jr., both of Moore Taylor Law Firm, P.A., of West Columbia; Kenneth E. Allen, of Columbia, for Appellant.

Milton G. Kimpson and Sean G. Ryan, both of Columbia, for Respondent South Carolina Department of Revenue.

Kathleen M. McDaniel, of Callison Tighe & Robinson, LLC, of Columbia, for Respondents Ellen Fishburne Triplett, Keith McIver, Samuel L. Munson, Jocelyn Munson, and Michael Hill.

WILLIAMS, J.:

Kan Enterprises, Inc. (Kan), d/b/a A1 Food Stores (A1), appeals the administrative law court's (ALC) denial of its application to renew a permit to sell beer and wine for off-

premises consumption. Kan argues the ALC erred in (1) misapplying the law, relying upon unsubstantiated opinion testimony, and failing to support its decision with the evidence; (2) depriving it of a vested interest; and (3) violating its constitutional rights. We affirm.

## FACTS/PROCEDURAL HISTORY

Kan [1] owns A1, a convenience store located at 4101 Monticello Road in the Hyatt Park/Keenan Terrace neighborhood of Columbia, South Carolina. A1 sold beer and wine pursuant to a seven day off-premises beer and wine permit issued by the South Carolina Department of Revenue (DOR) in 2012. On July 31, 2014, Kan filed an application with the DOR to renew the permit.[2] Although Kan met all of the statutory requirements for renewal, the DOR denied its application based upon timely filed public protests. The written protests included allegations that A1 promoted littering, panhandling, loitering, public drunkenness, and other criminal activity in its vicinity and nearby community.

Kan requested a contested case hearing with the ALC.[3] At the hearing, A1's manager, Vinno "Vinny" Sehgal, testified he had been employed at the store for two years and had about seven years of experience managing convenience stores. Sehgal stated he works at A1 for six to eight hours daily and was also available by phone "24/7." According to Sehgal, A1's employees neither sold alcohol to intoxicated customers nor allowed individuals to drink alcohol in the building or parking lot. However, Sehgal admitted Kan paid a fine after the South Carolina Law Enforcement Division cited one of its cashiers for selling alcohol to a minor.

In terms of security, Sehgal testified A1 maintains an interior and exterior camera system and employs a security guard during nighttime hours. A large sign is posted at the

1. Kan is a Georgia corporation entirely owned by Hadiya Ahibhai.

2. Alcohol retailers must apply for permits every two years. *See* S.C. Code Ann. § 61-4-500 (2009).

3. The ALC subsequently granted the protesters' motions to intervene. The protesters, who are individual respondents with the DOR in this appeal, were Ellen Fishburne Triplett, Keith McIver, Samuel L. Munson, Jocelyn Munson, and Michael Hill.

store's main entrance, which states the consumption of alcohol, narcotics, panhandling, and loitering are prohibited on the premises. Sehgal noted A1's employees check the parking lot and areas around the store three times a day for litter, which he believed could come from customers of other nearby businesses. Two local residents and A1's security guard then testified that A1's condition has improved since Sehgal took over as manager.

Columbia Police Department (CPD) Deputy Chief Melron Kelly testified he was previously assigned in 2012 as regional commander of the city's northern region in which A1 is located. During his time in this role, Kelly reported CPD had some issues of loitering, vagrancy, panhandling, and acts of violence in and around A1. In his experience, Kelly thought A1's practice of selling single cans of beer promoted panhandling and loitering.

Additionally, Kelly reported A1 posed a safety issue to CPD officers due to shootings and injuries to officers during attempted arrests at the store. Kelly thought A1 put a strain on law enforcement because CPD is often forced to "pull extra resources" at the store to ensure the safety of its officers and others. While the management of the nearby convenience stores worked with CPD to deter criminal activity, Kelly believed A1's problems did not improve during the year he spent as regional commander, and the store remained a burden on law enforcement.

Furthermore, Kelly testified A1 "overwhelmingly" had more calls for police services,[4] arrests, instances of violence, and officer-initiated activities than any of the three nearby convenience stores.[5] CPD received 304 calls for police services from A1 in 2011, 351 calls in 2012, 335 calls in 2013, and 324 calls in 2014. Between the hours of 7 P.M. and 7 A.M., the number of calls for services at A1 increased from 209 in 2012 to 252 in 2014. Kelly reported the number of calls for service at the Hess store was "drastically lower" than those at A1. Addition-

---

4.  Kelly explained a "call for services" is when a business owner, his employee, or a citizen calls "911" to receive police assistance at a specific location.

5.  These stores included a Hess convenience store, a Sonoco gas station, and an El Cheapo gas station.

ally, CPD made a total of eighty-three arrests at A1 from 2011 through 2014, compared with sixty arrests at Sonoco, forty-one arrests at Hess, and thirty-seven arrests at El Cheapo during the same four-year period.

CPD Officer Tyson Hass, who had worked in the city's northern region since 2012, reiterated Kelly's concerns with A1. Hass stated A1 had "vagrant issues, alcohol type violations, trespassing, [and] a lot of things that seem[ed] to stem from some sort of alcohol violation." Although he had not performed a specific study on the issue, Hass said he did not see any improvement at A1 during his tenure with the CPD. Hass also relayed that he broke his finger during a scuffle with a suspect resisting arrest at A1. Lieutenant Chris White, CPD's executive officer/assistant commander for the northern region, testified he received more complaints concerning A1 than any other convenience store in the area.

Concerned members of the local community also testified against renewing A1's permit. Christie Savage, president of the Eau Claire Community Council, reported she received numerous complaints from community members about loitering at A1, and she witnessed people congregating next to the store. Dolores Johnson, the director of a nearby residential facility for vulnerable adults, stated individuals frequently congregate in an alley next to one of her buildings after being run off by A1's security guard. In the last two years, Johnson witnessed individuals soliciting, "going to the bathroom," and doing "sexual things" in the alley.

Columbia City Councilman Sam Davis testified he received numerous complaints about A1. Councilman Davis believed A1 had a negative impact upon the area's attempted redevelopment. Davis supported his position by noting a nearby former dry cleaning business still remained vacant, despite its otherwise desirable location.

Samuel Munson, who lives approximately 250 feet from A1, maintained the store was a "continuing sore" on the local community. Munson stated he did not allow his eight-year-old son to play in their yard because of the foot traffic caused by A1. Additionally, Munson testified he was forced to pick up litter around his home on a daily basis, and based upon his observations and experience, the litter came from A1's cus-

tomers. To demonstrate the large volume of litter, Munson brought a grocery bag of trash he picked up that morning to the hearing, which contained approximately five beer cans and one beer bottle among other various food items.

Ellen Triplett, former president of the Hyatt Park/Keenan Terrace Neighborhood Association, testified that, in all of her years with the neighborhood association, she could "count on one hand the number of meetings where someone wasn't complaining about the A1 and the crime there and the litter there." Triplett stated she witnessed loitering, panhandling, and trash around the area, and claimed it was a "hot spot" for crime based upon the monthly crime reports she received through the neighborhood association. Another former neighborhood association president, Keith McIver, also testified to observing loitering, panhandling, and vandalism at A1 as well as being personally solicited by a prostitute near the store. The neighborhood association's current president, Michael Hill, stated he witnessed two people loitering next to A1 on the morning of the hearing.

On February 20, 2015, the ALC issued a final order denying Kan's application to renew the permit. The ALC found A1 was not a proper location for the sale of alcohol because it imposed an undue burden on law enforcement and had become a detriment to the surrounding community. Kan filed a Rule 59(e), SCRCP, motion to alter or amend judgment, arguing the ALC failed to apply two appellate decisions [6] that articulate a different standard of review for a permit renewal as opposed to an initial issuance. Specifically, Kan asserted the correct determination of renewal applications under *Taylor* and *Byers* is not whether a location is suitable for the sale of alcohol but whether it is "any less suitable for the sale of beer now than during the period of time that it had held a license, and during the period of time since its last renewal." Alternatively, Kan filed a motion for a stay and supersedeas.

On March 19, 2015, the ALC issued an order granting in part and denying in part Kan's Rule 59(e) motion as well as an amended final order clarifying its rulings. Addressing Kan's

---

**6.** *Taylor v. Lewis*, 261 S.C. 168, 198 S.E.2d 801 (1973); *Byers v. S.C. Alcoholic Beverage Control Comm'n*, 281 S.C. 566, 316 S.E.2d 705 (Ct. App. 1984).

position that the supreme court created a different standard of review for permit renewals, the ALC found:

> *Taylor* and *Byers* do not stand for the proposition that businesses that continue to have problems with littering, loitering, and other activities requiring constant calls to law enforcement without any noticeable improvements can simply continue to operate in a like manner as long as they were able to get permitted under like conditions beforehand.

Last, the ALC denied Kan's motion for a stay and supersedeas. This appeal followed.

## STANDARD OF REVIEW

The Administrative Procedures Act[7] (APA) governs appellate review of ALC decisions. S.C. Code Ann. § 1-23-610(A) (Supp. 2016). The APA provides:

> The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C. Code Ann. § 1-23-610(B) (Supp. 2016). Accordingly, the ALC's decision "should not be overturned unless it is unsupported by substantial evidence or controlled by some error of law." *Original Blue Ribbon Taxi Corp. v. S.C. Dep't of Motor Vehicles*, 380 S.C. 600, 604, 670 S.E.2d 674, 676 (Ct. App. 2008). "Substantial evidence, when considering the record as a whole, would allow reasonable minds to reach the same conclusion as the [ALC] and is more than a mere scintilla of evidence." *Id.* at 605, 670 S.E.2d at 676.

---

7. S.C. Code Ann. §§ 1-23-310 through -400 (2005 & Supp. 2016).

## LAW/ANALYSIS

### I.  Permit Renewal

Kan first argues the ALC misapplied *Taylor* in reviewing its renewal application. Even if the ALC correctly applied the law, Kan contends the court relied upon unsubstantiated opinion testimony and failed to base its decision on the evidence. We disagree.

Section 61-4-520 of the South Carolina Code (2009) generally sets forth the requirements an applicant must satisfy to be authorized to sell retail beer or wine in this state. Importantly, DOR cannot issue a permit unless it determines that the location of the applicant's business is a "proper one." S.C. Code Ann. § 61-4-520(5) (2009). Although the statute does not define what constitutes a "proper" location for the retail sale of beer and wine, this court "recognizes the rather broad discretion vested in the [fact-finder] in determining the fitness or suitability of a particular location." *Fast Stops, Inc. v. Ingram*, 276 S.C. 593, 595, 281 S.E.2d 118, 120 (1981). In deciding whether a location is a proper one, the fact-finder may consider any evidence showing adverse circumstances. *Palmer v. S.C. Alcoholic Beverage Control Comm'n*, 282 S.C. 246, 249, 317 S.E.2d 476, 478 (Ct. App. 1984). Thus, "[t]his determination of suitability is not solely a function of geography but involves an infinite variety of considerations related to the nature and operation of the proposed business and its impact upon the community." *Id.* The court should weigh evidence of the location's burden on law enforcement in deciding its suitability. *See Moore v. S.C. Alcoholic Beverage Control Comm'n*, 308 S.C. 160, 162, 417 S.E.2d 555, 557 (1992); *Fowler v. Lewis*, 260 S.C. 54, 57, 194 S.E.2d 191, 192 (1973).

In *Taylor*, our supreme court addressed an administrative finding that the location of a neighborhood grocery store and filling station, which had previously operated under beer permits, was unsuitable for the sale of alcohol. 261 S.C. at 169–70, 198 S.E.2d at 801. The now-defunct Alcoholic Beverage Control Commission (ABC) denied the store owner's application for an off-premises beer permit after hearing several witnesses in opposition. *Id.* The witnesses testified the business's location lacked adequate police protection and passing motorists often threw beer cans into neighboring yards. *Id.* at 170,

198 S.E.2d at 802. Additionally, the witnesses claimed the store's sale of beer would, *inter alia*, cause neighborhood disturbances, threaten the safety of children, lead to dangerous traffic, and reduce nearby property values. *Id.*

On appeal, however, the circuit court reversed the ABC's decision as entirely without evidentiary support and ordered the issuance of the permit. *Id.* at 170, 198 S.E.2d at 801. The supreme court subsequently upheld the circuit court's decision. *Id.* at 172, 198 S.E.2d at 803. Specifically, the supreme court agreed that the relevant testimony by the opposition's witnesses consisted entirely of factually unsupported opinions and conclusions. *Id.* at 171, 198 S.E.2d at 802. Moreover, the supreme court indicated the ABC had issued beer permits for the business's location for approximately five years prior to the contested application and the record was "devoid of any showing that the location is any less suitable for the sale of beer now than during the prior (5) year period."[8] *Taylor*, 261 S.C. at 171–72, 198 S.E.2d at 802.

■ In the instant case, Kan argues the ALC misapplied *Taylor* to this case, stating no evidence was presented at the hearing showing that Al's location was any less suitable for the sale of beer and wine now than in the last twenty years it has operated under a permit or its last renewal in 2012. In other words, Kan seems to contend that, under *Taylor*, the DOR may not deny an off-premises permit renewal unless it is proven that conditions surrounding a proposed location are *worse* than at the time of the permit's initial issuance or last renewal.

Contrary to Kan's position, we find *Taylor* does not articulate a more lenient suitability standard for the renewal of an off-premises permit as opposed to its initial issuance. Although the supreme court in *Taylor* considered the fact that the grocery store had operated under prior beer permits, the ultimate inquiry remained whether its location was a proper one for the sale of beer. *See id.* at 172, 198 S.E.2d at 802 ("The order of [the ABC] denying the permit assigns no factual basis

---

8. Similarly in *Byers,* this court cited *Taylor* in finding the record was devoid of any showing that a club was less suitable for the sale of beer than in the twenty years in which it had operated under beer permits. *Byers,* 281 S.C. at 569, 316 S.E.2d at 707.

or reason for its finding of unsuitability and the record before us reveals none."). Upon our review of the record in the instant case, substantial evidence [9] supports the ALC's findings that conditions at A1 made it unsuitable for the sale of alcohol.

CPD officials testified about the vast prevalence of crime at and near A1 and the strain the store put on law enforcement resources. From that standpoint, CPD's empirical data revealed A1 had not improved—and had even deteriorated—since 2012. A1 had significantly more calls for police services and arrests than any of the three nearby convenience stores from 2011 to 2014, and nighttime calls for police services increased during that period.[10] Furthermore, local community members testified A1 had not improved. Unlike the speculative opinion testimony by the witnesses in *Taylor*, the community members in this case supported their conclusions with their own personal observations and experiences with loitering, littering, panhandling, and other criminal activity at or near A1.[11]

---

9. The supreme court decided *Taylor* under the previous "any evidence" standard for administrative appeals, which the APA has since changed to the "substantial evidence" standard of review. *See Schudel v. S.C. Alcoholic Beverage Control Comm'n*, 276 S.C. 138, 139–40, 276 S.E.2d 308, 308–09 (1981) (holding the APA changed the standard of review for alcohol permit cases to substantial evidence).

10. On appeal, Kan argues the increase in calls for service are explained by Sehgal's testimony that he instructed A1's employees to call the police in response to criminal activity and "not to take matters into their own hands." Even though such instruction is laudable, the ALC properly considered this evidence as relevant on the extent of crime at A1 and its undue burden on law enforcement. *See Moore*, 308 S.C. at 162, 417 S.E.2d at 557 (considering a proposed location's burden on law enforcement when determining its suitability to sell alcohol).

11. Kan contends the ALC cited criminal activity that occurred in an alley it did not own or control. Moreover, Kan argues A1 has become a "scapegoat" for the local community's ills, stating none of the witnesses had personal knowledge that the litter came from its store and not other, nearby businesses. Upon our review, however, Johnson and A1's security guard testified that loiterers would congregate in the subject alley after being directed to leave A1's premises. Additionally, Samuel Munson testified he observed people throw litter onto his yard after walking from the direction of A1.

Nevertheless, Kan submits the ALC ignored Sehgal's testimony about the ways in which A1 was improving security and its overall atmosphere. However, we again acknowledge our limited standard of review concerning administrative matters. *See Original Blue Ribbon Taxi Corp.*, 380 S.C. at 604, 670 S.E.2d at 676 (stating the ALC's decision "should not be overturned unless it is unsupported by substantial evidence or controlled by some error of law"). We find substantial evidence from the testimony of law enforcement and local community members supports the ALC's finding that A1 was no longer a suitable location for the off-premises sale of beer and wine. Therefore, we affirm the ALC's decision to deny A1's application to renew the permit.

## II. Vested Interest

■ Kan next argues the DOR's denial of its application for renewal deprives it of a vested interest in its off-premises beer and wine permit. We disagree.

■ Licenses and permits to sell alcohol are property of the DOR. S.C. Code Ann. § 61-2-140(B) (2009). According to our supreme court:

Liquor licenses are neither contracts nor rights of property. They are mere permits, issued or granted in the exercise of the police power of the state to do what otherwise would be unlawful to do; and to be enjoyed only so long as the restrictions and conditions governing their continuance are complied with.

*Feldman v. S.C. Tax Comm'n*, 203 S.C. 49, 57, 26 S.E.2d 22, 25 (1943).

In accordance with the foregoing authorities, we reject Kan's argument that it had any vested interest in the off-premises beer and wine permit issued to it by the DOR. Therefore, we affirm the ALC on this issue.

## III. Constitutional Rights

■ Last, Kan argues the ALC violated its constitutional rights to due process and equal protection. We find this issue unpreserved.

In its order denying Kan's Rule 59(e), SCRCP, motion, the ALC found Kan did not raise these arguments at the hearing when it had the opportunity to do so, and thus, they were unpreserved. We affirm the ALC's conclusion. *See Kiawah Prop. Owners Grp. v. Pub. Serv. Comm'n of S.C.*, 359 S.C. 105, 113, 597 S.E.2d 145, 149 (2004) (stating a party may not raise an issue for the first time in a motion to reconsider, alter, or amend a judgment that could have been presented prior to judgment).

## CONCLUSION

Based on the foregoing analysis, the ALC's decision to deny Kan's application to renew the off-premises beer and wine permit is

**AFFIRMED.**[12]

SHORT and KONDUROS, JJ., concur.

---

12. We decide this case without oral argument pursuant to Rule 215, SCACR.